STATE OF IOWA, Appellee, v. JUDD STENNETT et al., Appellants.

No. 42870.

MAY 14, 1935.

REHEARING DENIED SEPTEMBER 27, 1935.

Earl R. Ferguson, for appellants Judd Stennett, Bud Mordhorst, and Jack Griffin.

Frank Wisdom, for appellant George Baker.

Edward L. O'Connor, Attorney General, Walter F. Maley, Assistant Attorney General, and Willis A. Glassgow, County Attorney, for appellee.

ALBERT, J.—██ The four defendants were jointly indicted and the indictment contained two counts; the first count charging breaking and entering with intent to commit a public offense, to wit, larceny; and the second count charging, in connection with the crime charged in the first count, larceny from a building in the nighttime, under Code section 13008. To this indictment all the defendants, except Baker, demurred. One of the grounds of the demurrer was that the said indictment "is duplicitous and charges these defendants with two separate and distinct offenses or crimes, not permissible by the statute, and contrary to law and the statutes of this state." This demurrer

was overruled, and the ruling of the court so made is the first question discussed.

The validity of the contention of the defendants in relation to this ground of the demurrer calls for the construction of Code sections 13737, 13738, and a part of section 13738-b1. The first section above referred to provides that the indictment must charge but one offense, etc. The second section provides that in case of compound offenses, where, in the same transaction, more than one offense has been committed, the indictment may charge the several offenses and the defendant may be convicted of any offense included therein. The third of the sections above referred to provides:

"An indictment may charge in separate counts:

"1. A burglary and one or more other indictable offenses committed in connection with said burglary. The term 'burglary' shall embrace any violation of sections 12994 to 13004, inclusive. * * *"

We had before us this same question in the case of State v. Frey, 206 Iowa 981, 221 N. W. 445. We there held that the question of duplicity of an indictment must be raised by demurrer, and if not so raised it is waived. In that case we did not pass on the question we have before us in this case.

Later, in the case of State v. Leasman, 208 Iowa 851, 226 N. W. 61, a companion case to the Frey case, we again were confronted with the application of these statutes, and the question was properly raised by demurrer. In the Leasman case we held that the indictment in the case was bad because it charged two crimes without alleging or pointing out in any way that the crime charged in the second count "was committed in connection with the crime of burglary or breaking and entering." The inference to be drawn from the ruling in the Leasman case is that, if the crime charged in the second count is alleged to have been committed in connection with the crime charged in the first count, then the assault on the indictment is not good. We think the inference made in that case is the correct statement of the law.

The aforesaid section 13738-b1 specifically authorizes this kind of an indictment when "a burglary and one or more other indictable offenses committed in connection with said burglary" are charged. We think that the above provision of the statute

was specifically intended to cover the exact situation we have in this case, and the indictment is good because it alleges in terms that the matters charged in the second count of the indictment were "committed in connection with" the matters charged in the first count of the indictment. The court's action in over-ruling the demurrer, therefore, was proper.

■■■ It is next urged that the court erred in not submitting to the jury the included offenses of larceny, or larceny in the nighttime, and also the included offense of attempting to break and enter a building with intent to commit a public offense. That these are all included offenses in the matters charged in either the first or second counts of the indictment may be admitted. But the rule governing the court in submitting two offenses is discussed in the case of State v. Marshall, 206 Iowa 373, 220 N. W. 106, which lays down the exception to this rule in these words:

"* * * if there is no evidence from which the jury could find the defendant guilty of the included offense, then such included offense need not be submitted. [Citing cases.] Also, where under the evidence the defendant is clearly guilty of the offense charged or not guilty, it is not error to fail to give instructions with reference to included offenses." Citing cases.

We think these last two rules are particularly applicable to the situation before us and, therefore, the court did not err in not instructing on included offenses. A summary of the evidence showing the application of this rule will be made later in the opinion.

■■■ It is insisted that the evidence is insufficient to identify the defendants, or connect them with the commission of the crime; and especially this is urged in behalf of Jack Griffin.

The jury could have found from the evidence in the case that Tyler Brothers were engaged in the manufacture and sale of soft drinks, and the wholesale distribution of candy and beer. Their place of business in Shenandoah was located at No. 111 Blossom street, being a building which extended east and west, on the north side of the alley. On the alley side of said building there were a number of windows. The beer handled by this concern was Country Club, Schmidt's City Club, and Blue Ribbon beer. Across the alley to the south was a building occupied by a restaurant conducted by the Drurys. In the Tyler

plant, at the time in question here, there were numerous cases of beer piled just inside the windows on the south side of the building. On the morning of the 21st of June, 1934, a window was broken in the alley side of the Tyler building, and two cases of beer were taken from said building and carried away. This occurred shortly after 2 o'clock a. m.

The night watchman of the town testifies that he inspected this building and the windows in controversy about 11 o'clock on the night of the 20th, and there were none broken; and again about 1:35 or 1:40 a. m., and the windows were all right and were closed. ''At about 2:20 or 2:30 in the morning I saw them again, and the first window west of the big door that they drive in was broken. The bottom sash was out.'' About 11 o'clock that evening he saw Mordhorst, Stennett, Baker, and Griffin, with a fellow called Runt Benedict. They parked their automobile in front of what is called the Auracher building, which is across from the Tyler building. They were in Mordhorst's car at the time, Stennett and Griffin were sitting in the car and Baker was standing alongside the car. ''I saw them again later, about 12 o'clock. They had then parked their car about 30 or 40 feet north of the Drury Café, on the east side of Blossom street. At about 15 minutes till 2 they parked their car a little farther south and headed north on Blossom street. There were five men in the car at that time. That is the last I saw of them that night.''

Mrs. Fern Drury testifies that she was in the cafe on the night in question. About 2 o'clock in the morning of the 21st of June, her attention was attracted to the breaking of glass. She went down the stairway toward the back door. Just then two men came into the alley from the street. She saw them go to the window and break out the wooden crosspieces in the sash and pull out the glass, and then remove a case of beer. They set it in the shadow, and removed another case and carried it to the car, which was on Blossom street in front of Tyler Brothers. They went back and got the first case and took it to the car. She had ''a pretty fair look at them. One of them was a short man, dark-complected, wore a blue shirt and dark trousers. The other was taller, quite a little taller, wore a light blue shirt and lighter trousers. The taller one of the two men had come in (to the cafe) in the afternoon of the day before, the 20th, to inquire about Stennett, and on the night of the 20th, about midnight,

he came in and bought five bottles of pop. This was the taller one. I recognized him as the same man who had been in in the afternoon. A little later the shorter one of the two had been in and bought five bottles of pop. I saw them later in the alley. They were the same men that were in the alley. I did not see them again. I attended the hearing in Hackett's court. I saw them there. The shorter one gave his name as Stennett and the taller one as Baker.''

The witness' attention was then called to the four defendants sitting in the presence of the jury, and she said:

''The one on the left very much resembles the taller one, and the third one resembles the shorter one. He gave his name as Stennett. I had a good look at the men three times as they passed directly in the light. Of course, I saw them take two cases of beer and come back, and then I saw them when they came into the alley the first time that I saw them. In my own mind I was positive enough of the identification.''

The witness Douthit testifies that his job was supplying ice for the light company and his working hours were from 8 in the evening until 4 in the morning. He was at work on the night of the 20th and 21st. ''Four men come to the plant in a car early that morning. I didn't know any of them except Mordhorst. The names they gave in Hackett's court were Mordhorst, Stennett, Baker, and Griffin. They are the men sitting here in front of the rail. When they came to the plant one of them wanted to know if they could have some ice. I sold the ice to them. He said he wanted to ice some beer, and I iced it for him. It was Schmidt's City Club beer. There were two cases, one of quarts and one of pints. This was about 3 o'clock in the morning of the 21st of June. The man who drove the car was the man they called Stennett. Mordhorst paid for the ice.''

Another witness testifies that after midnight on the 21st of June, he was asleep at the place where he lived, and Stennett woke him. He got up and went with him (Stennett). ''Three other men were with him, Mordhorst, Baker, and Griffin. They had a couple of cases of beer in the car. It was City Club and was iced. Stennett was driviing. We went out to a schoolhouse south of Shenandoah, about a mile or better, and drank part of the beer and put the bottles back in the case. We then went to the county line, where we stopped for awhile and drank some

more beer, and put the empty bottles back in the case and left it there. We had both cases when we started." They then went to a grove on the other side of what is called Center street, about a mile and a half north of Shenandoah. The witness then went to sleep. Stennett stayed with him. The others left. The next thing he knew, the police woke him. He says: "They were all pretty drunk; that is, they were pretty well organized."

The night watch and some other officers went out in the country with the chief of police and found the bottles referred to by the previous witness, near the schoolhouse, and also found the empty case and some empty bottles that were branded "City Club". He then went to the grove referred to and found a part of the case of pints, and Stennett. The pints were brought into court and identified as exhibits.

Other witnesses testified to finding the empty bottles and beer cases referred to. A police officer of the city testifies that he was present when Baker and Griffin were arrested; that he knew Stennett and Mordhorst; and that he saw them on the street near Drury's Cafe about 7 or 8 o'clock in the evening of the 20th. "There were five of them, and I think a fellow by the name of Benedict was with them, if I am not mistaken."

The evidence shows that a case of pints and one of quarts were missing from the Tyler building after the burglary.

From this general statement of the facts we have to say, in response to one of the errors alleged by the defendants, that the evidence as to the identification of each of these defendants and his connection with the crime in controversy made a jury question.

It is also urged that the stolen property is not sufficiently identified; that is to say that, while these men may have had this beer, and the cases bearing the same marks as those that were stored in the Tyler building, such proof is not sufficient.

The general rule is that the identity of stolen goods may be proven by direct or circumstantial evidence; the weight, credibility, and sufficiency of the same being a question for the jury. See State v. Johnson, 210 Iowa 167, 230 N. W. 513; State v. Graham, 203 Iowa 532, 211 N. W. 244, and cases there cited. We think the question of the identity of the property was a question for the jury, under the record made in this case.

██ Complaint is made of instruction No. 23. This instruction reads as follows:

"You will, therefore, carefully consider and weigh all of the evidence offered and submitted to you upon the trial, and all of the facts and circumstances disclosed by the proof which may throw light upon the questions of whether or not the defendants, or any one or more of them, are guilty of the crimes charged in the indictment, * * * that is, you must determine what facts are shown by the evidence. * * *"

This is alleged to be erroneous because it does not direct the jury to take into consideration "the lack of testimony upon some material points." The assaulted instruction is preceded by an instruction defining reasonable doubt, and in so doing the court said that, if doubt arose in the jurors' minds, from a consideration of all the testimony "or from the lack of testimony upon some material point," etc. We do not think, therefore, that the objection to the instruction in question is tenable.

■■■ Complaint is also made against certain remarks made by the prosecuting attorney in his address to the jury. While the remarks in question are not to be commended and ought to be avoided, the question of whether they amount to misconduct such as to warrant a reversal is primarily for the presiding judge, and we are not disposed to hold them reversible error unless there is a manifest abuse of discretion. See State v. Long, 215 Iowa 494, 245 N. W. 726. We do not think that this misconduct was sufficient to warrant a reversal.

■■■ After the close of the case and its submission to the jury and the return of the verdict, and on the 13th of September, the district court gave the defendants ten days in which to file a motion in arrest of judgment, a motion for judgment notwithstanding the verdict, and a motion for a new trial and exceptions to the instructions. The defendants filed such motions. It may be said that, under the criminal practice of this state, there is no such thing known as a motion for judgment notwithstanding the verdict. A motion in arrest of judgment, under the present practice in criminal cases, can be granted only "when upon the whole record no legal judgment can be pronounced", and in order to be considered must point out wherein the deficiency exists.

■■■ It is further insisted that the jury were guilty of misconduct in their deliberations because they discussed the fact, brought out in the county attorney's argument, that the defend-

396

ants, and each of them, objected to testifying in their own behalf; and that the county attorney pressed this question home to the jury in a very forceful way. This objection is not tenable because of the fact that the remarks of the county attorney are not made of record and no objection was made thereto at the time of the argument. Secondly, while there are numerous cases under a pre-existing statute that hold that it is reversible error for the county attorney to refer to the fact that a defendant has not taken the witness stand or testified in his own behalf, the statute (Code 1927, section 13891) which was the basis of these holdings was repealed by the Forty-third General Assembly (chapter 269), and it is now no longer error for the prosecuting attorney to refer to the fact that the defendant has not taken the witness stand to testify in his own behalf.

■■■ The jury found each of the defendants guilty on each of the two counts charged in the indictment, and the court entered a separate judgment against each of the defendants in similar form. Section 13738-b2 of the Code provides that under section 13738-b1 separate judgments shall be rendered on each count on which the accused is convicted. We think the judgment entry made in this case is a substantial compliance with the requirements of the aforesaid section of the statute.

We have given attention to some other errors assigned, but find nothing of merit; and after reviewing the whole record we find that the defendants had a fair and impartial trial, with no prejudicial error.—Affirmed.

ANDERSON, C. J., and DONEGAN, KINTZINGER, MITCHELL, POWERS, and HAMILTON, JJ., concur.